COURT OF APPEALS
DECISION
DATED AND FILED

August 16, 2022

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2021AP1839**

STATE OF WISCONSIN

Cir. Ct. No. 2019TP186

IN COURT OF APPEALS
DISTRICT I

IN RE THE TERMINATION OF PARENTAL RIGHTS TO M.J.S., A PERSON UNDER THE AGE OF 18:

M.K.S.,

PETITIONER-RESPONDENT,

V.

R.J.F.,

RESPONDENT-APPELLANT.

APPEAL from an order of the circuit court for Milwaukee County: MARSHALL B. MURRAY, Judge. *Reversed and cause remanded*.

Before Brash, C.J., Donald, P.J., and Dugan, J.

¶1    DUGAN, J.[1]    Richard appeals an order of the trial court terminating his parental rights to his daughter, Morgan.[2]    On appeal, he argues that he received ineffective assistance of counsel, that he is entitled to postdisposition discovery, and that the relevant grounds statute, WIS. STAT. § 48.415(6), is unconstitutional as applied to him.    We conclude that Richard received ineffective assistance of counsel at his jury trial on the grounds phase of these proceedings.    Thus, for the reasons set forth below, we reverse the order terminating Richard's parental rights.

## BACKGROUND

¶2    Richard and Michelle were in a relationship and wanted to a have a child.    Michelle originally suffered a miscarriage, but she later became pregnant with a baby girl, Morgan, around December 2018.    After the relationship ended in the beginning of 2019, Michelle sought a temporary restraining order against Richard in April 2019 and obtained a permanent injunction in May 2019.    As a part of her petition for the injunction, Michelle described Richard's "very emotionally abusive" behaviors towards her.    However, she also stated that "[Richard] is also making it very difficult to adopt my child out."

---

[1] This appeal was converted from a one-judge appeal to a three-judge appeal under WIS. STAT. RULE 809.41(3) (2019-20).    All references to the Wisconsin Statutes are to the 2019-20 version unless otherwise noted.

Pursuant to WIS. STAT. RULE 809.107(6)(e), this court is required to issue a decision within thirty days after the filing of the reply brief.    We may extend the deadline pursuant to WIS. STAT. RULE 809.82(2)(a) upon our own motion or for good cause.    *See Rhonda R.D. v. Franklin R.D.*, 191 Wis. 2d 680, 694, 530 N.W.2d 34 (Ct. App. 1995).    On our own motion, we now extend the decisional deadline through the date of this decision.

[2] To protect the confidentiality of these proceedings, we use pseudonyms to refer to the individuals in these proceedings.

¶3    Around the same time in 2019, Michelle also contacted an adoption agency, Brightside Adoptions, located in Ohio that helped her locate a couple in Alabama who wanted to adopt the baby.  After the match was made, the couple provided support to Michelle throughout the pregnancy, and as part of the adoption process, the couple also paid for an attorney to represent Michelle in the termination of Richard's parental rights case and hired Wendy Rhodes at Bethany Christian Services to provide pregnancy counseling to the biological parents.[3]  Rhodes had frequent contact with Michelle throughout the pregnancy, but when Rhodes contacted Richard after the termination of parental rights (TPR) petition was filed, he directed her to contact his attorney.  During the trial, Rhodes testified that Richard's counsel called her and asked Rhodes not to call Richard and told Rhodes that if she needed something she could call counsel, and counsel would be happy to talk with Richard and get back to Rhodes.  At the time Morgan was born, the prospective adoptive parents came to Wisconsin and took her to their home in Alabama, directly from the hospital.  The child has been in Alabama with the prospective adoptive parents since her birth in September 2019, and Richard has never been able to meet her.

¶4    Michelle filed a petition to terminate Richard's parental rights ten days after Morgan's birth and alleged that Richard failed to assume parental responsibility under WIS. STAT. § 48.415(6).[4]  Richard contested the petition and

---

[3] It is unclear whether Rhodes was hired to provide counseling to both parents.  In the permanency plan dated October 14, 2019, Rhodes stated, "Counseling services were offered to the birth parents in order to assist them in evaluating the options available.  The birth parents freely and voluntarily choose the option of adoption as being in the best interest of their child."

[4] In order to proceed with the adoption, Michelle voluntarily consented to the termination of her parental rights, but only if Richard's parental rights were terminated.  Her rights are not at issue in these proceedings.

sought visitation. He also established his paternity through a DNA test, but he did not initiate proceedings in family court to become the adjudicated father.

¶5 At his first court appearance on October 23, 2019, Richard requested a DNA test to establish that he was Morgan's father. The trial court ordered the DNA test and adjourned the matter to December 6, 2019, for status regarding the DNA test and for the State Public Defender's Office (SPD) to appoint an attorney for Richard. At the hearing on December 6, 2019, counsel had not yet been appointed, but the DNA test showed that Richard was Morgan's biological father. The trial court adjourned the case again for appointment of counsel. Richard then orally moved for visitation rights. He argued that a lot of time had passed and he and his family wanted to meet Morgan. Both Michelle's counsel and the guardian ad litem (GAL) objected to visitation, arguing that there should be no contact until the conclusion of the TPR case. The trial court accepted the oral motion for visitation and set the motion for a contested hearing on January 13, 2020.

¶6 On January 13, 2020, counsel still had not been appointed for Richard, and the trial court adjourned the matter again to January 28, 2020, to allow time for the appointment of counsel. Richard then asked if visitation was still denied and if so, why. The court stated it was because the motion had not been heard. Counsel was finally appointed and appeared at the hearing on January 28, 2020. However, trial counsel was not prepared at the hearing to address the visitation motion and asked that the hearing be adjourned. The court granted the request, and after several adjournments due to COVID-19, the motion was set for June 11, 2020.

¶7     The hearing on Richard's motion for visitation was heard on June 11, 2020.[5]  At that time, Morgan was almost nine months old.  Trial counsel told the trial court that Richard wanted to parent Morgan and would like to start with visitation.  She pointed out that there were logistical issues because Morgan was in Alabama and suggested starting with some kind of virtual visitation—Zoom or Skype—to start building that parental relationship with Morgan.  She also stated that Richard would like to have phone calls, emails, or texts with the proposed adoptive parents to get updates on how Morgan was doing along with the virtual visits with Morgan on a regular visiting schedule.  Trial counsel said that Richard wanted to talk with Morgan, watch her play, and see how she was doing.  She also said that Richard wanted to visit in person and if that required that he travel to Alabama he would be willing to do so.  She also suggested that maybe the couple could meet him part way to Wisconsin.

¶8     Michelle's counsel and the GAL argued that Richard's request for visitation should not be allowed given the circumstances—including the COVID-19 pandemic and because it would be a hardship on the proposed adoptive parents and Morgan to come to Wisconsin.  The trial court summarized Michelle's counsel's additional argument as "with the TPR pending [counsel] would want to avoid the risk that there could be some level of attachment and then a termination of parental rights, and that could be harmful."  The GAL further argued that it was not in Morgan's best interest to have visitation with Richard—it would be confusing for her.  He further argued that logistically, with the distance, visitation

---

[5] The Honorable Mark Sanders presided over the hearing addressing Richard's request for visitation.  The Honorable Marshall B. Murray presided over the trial, entered the order terminating Richard's parental rights, and denied Richard's postdisposition motion.

would be a nightmare. The GAL also indicated that the prospective adoptive parents would not want to have any in-person visits in Alabama and were not open to having contact with Richard in the form of phone calls or text messages and would like something limited. He also argued that he had concerns about Richard's conduct toward Michelle in their relationship and that Michelle is scared of Richard. He also expressed concerns that Richard would try to control the prospective adoptive parents and that providing visitation at this stage would traumatize and harm Morgan by introducing her to a father whose rights were being terminated.

¶9 The trial court responded that based on the injunction issued against Richard it recognized there was some domestic violence in Richard and Michelle's relationship and that Michelle is afraid of him. It then stated that visitation would not require contact between Michelle and Richard—it would be set up independently. When the court mentioned that some of the logistics could be overcome by virtual visits, the GAL argued that Morgan was only nine months old and, therefore, the only meaningful visitation that could happen would be in-person visitation and that in-person visitation would not be in Morgan's best interest. When the GAL asserted that nothing really meaningful could be accomplished with a nine month old child through virtual visits, the court responded, "[T]hat makes sense."

¶10 Trial counsel argued that she disagreed with Michelle's counsel and the GAL's argument that the court should wait until the termination of rights is concluded because if "they win" there would be no reason to have visits. She argued that "if I win, then we have just prolonged the period of time to where this child is not having any contact with the parents." Both Michelle's counsel and the GAL again responded that virtual visitation was not in Morgan's best interest.

¶11    The trial court then ruled on the motion.  It began by stating that "[Richard] is the biological father of this child and under all normal circumstances would have some contact and visitation with the child."  It then stated that we are not living in normal circumstances and this case does not present normal circumstances.  The court then stated that "the controlling factor here is what's in [Morgan's] best interest.  Not what's in the parent's best interest."  It then stated that the context of the case was that the child was nine months old, she had not had any contact with Richard, and she had been placed with the prospective adoptive parents since being released from the hospital, during a global pandemic.  It stated that it would not allow face-to-face visits because of the pandemic and the risks of COVID-19—it was not in Morgan's best interest to allow the risk of COVID-19.

¶12    Next, the court said that virtual visits are not appropriate because there is a risk of disruption of Morgan's "current environment" and regardless of the outcome of the case "that level of uncertainty and disruption created by those visits is not in [Morgan's] best interest."  It then stated that because the trial was only one hundred nine days away[6] "there is no need to run the risk of disruption in the short-term" and "potential attachment … that could be disrupted if there is ultimately a termination of Richard's rights.[7]  The court then stated that Richard's past behavior with marijuana and anger would be a risk of disruption.  It stated that interacting with one's child while "high" is not good and interacting with

---

[6] We note that the trial did not occur until June 21, 2021, a little over a year after the motion hearing.

[7] The trial court was referring to potential emotional attachment between Richard and Morgan.  Later the trial court noted that there was a relatively low likelihood that, with occasional video visits, there would be any emotional attachment by a nine-month old to the other person on the video screen.

one's child and then getting upset or attempting to exert some verbal or psychological control over the child or the prospective adoptive parents is not good. The court then determined that the only method of contact it would permit was email between Richard and the potential adoptive parents and then maybe progress to text or telephone contact between them. Richard was not to have any direct contact with Morgan.

¶13 Michelle's counsel then told the court that he did not think "the adoptive parents" would be open to phone calls or texts messages. He said they would be willing to do some exchange of photographs to show stages of Morgan's development. The court then stated that it would like to see Richard and the prospective adoptive parents begin some level of communication and if during those communications the prospective adoptive parents could not effectively communicate with Richard because of some of his behaviors they could just tell him that they are going to cease communication with him.

¶14 Pursuant to the trial court's order, an email account was set up. Richard and the couple exchanged a handful of emails and pictures using this account, but communication broke down by November 2020 shortly after an email from the couple to Richard that stated that they were "extremely concerned about how traumatic it would be for [Morgan] if she had to leave the only family and home that she's ever known since birth. [Morgan] is truly bonded with us and is so happy." The couple went on to say, "We are willing to send pictures and updates periodically, if we can resolve this matter outside of the court."

¶15    The case proceeded to a jury trial on June 21, 2021. Richard, Michelle, Rhodes, and the prospective adoptive parents testified.[8] The jury heard extensive testimony from Richard and Michelle about their "toxic" relationship, the reason the relationship ended, text messages that Richard sent to Michelle that ranged from apologetic to angry, and the injunction that Michelle obtained in 2019, including the incident in which Richard "put his hands on [her]" that Michelle testified led to the injunction.[9] However, Richard also testified that he assisted Michelle in the early days of her pregnancy by running errands for her, buying her groceries, and taking her to the hospital during the early stage of the pregnancy when Michelle was bleeding. Michelle also testified about her childhood, including her own experience being adopted and the traumas she suffered as a child, and her mental health. Both Richard and Michelle also testified to their drug use, particularly marijuana.

¶16    In addition to testimony about Richard, Michelle, and their relationship, the jury also heard testimony from the witnesses about Richard's role in his daughter's life. Michelle, Rhodes, and the prospective adoptive parents all testified that Richard had failed to ever provide financial support, gifts, cards, or anything else for the child and generally failed to be involved in the child's life. The prospective adoptive parents also testified that they had provided for the

---

[8] Rhodes was presented to the jury as a social worker, and the prospective adoptive parents were presented as the foster parents or the placement providers.

[9] Michelle also testified that Richard put his hands on her and held her arm partly because he was trying to calm her down and stop her from leaving during an argument they were having. Richard further questioned the overall legitimacy of Michelle's restraining order based on her comment in the petition where Michelle said, "He is also making it very difficult to adopt my child out," and the timing of Michelle's petition for the injunction that closely followed Michelle's contact with Brightside Adoptions.

child's daily care and needs since her birth. Richard and the prospective adoptive parents further testified that they had email contact and that the email contact ended following only a handful of emails. The jury further heard testimony that Richard failed to become the adjudicated father. Rhodes and Richard testified that Richard wanted Rhodes to only communicate with his lawyer.

¶17 Following the trial, the jury, with two dissenting jurors, found that Richard failed to assume parental responsibility, and the trial court consequently found Richard to be an unfit parent.[10] The case proceeded to the disposition phase, and the trial court found that it was in Morgan's best interest to terminate Richard's parental rights.

¶18 Richard filed a postdisposition motion in which he argued that he received ineffective assistance of counsel. He also argued that he was entitled to postdisposition discovery of Brightside Adoption's records and that WIS. STAT. § 48.415(6) was unconstitutional as applied to him because he was denied the opportunity to establish a substantial parental relationship with his daughter. The trial court held a *Machner*[11] hearing at which trial counsel testified. The trial court subsequently denied Richard's motion, and Richard now appeals.

## DISCUSSION

¶19 On appeal, Richard raises the same arguments—that he received ineffective assistance of counsel, that he is entitled to postdisposition discovery of

---

[10] During deliberations, the jury submitted a question asking why there was no email communication from November 2020 until the time of trial in June 2021. The judge responded that there was no evidence in the record to answer that question.

[11] *State v. Machner*, 92 Wis. 2d 797, 285 N.W.2d 905 (Ct. App. 1979).

the records from Brightside Adoptions, and that WIS. STAT. § 48.415(6) is unconstitutional as applied to him because he was denied an opportunity to establish a substantial parental relationship with his daughter.

¶20     We conclude that Richard received ineffective assistance of counsel. Consequently, we do not address Richard's argument that he is entitled to postdisposition discovery.  *See State v. Blalock*, 150 Wis. 2d 688, 703, 442 N.W.2d 514 (Ct. App. 1989).  Moreover, because we can resolve this case on the grounds of ineffective assistance, we need not address the constitutional issue that Richard presents.  *See State v. Bobby G.*, 2007 WI 77, ¶3, 301 Wis. 2d 531, 734 N.W.2d 81.  Accordingly, we remand for a new fact-finding hearing.

## I.     Overview of Termination of Parental Rights Proceedings

¶21     "Wisconsin has a two-part statutory procedure for the involuntary termination of parental rights."  *Steven V. v. Kelley H.*, 2004 WI 47, ¶24, 271 Wis. 2d 1, 678 N.W.2d 856.  In the first phase at issue here, called the "grounds" phase, "the petitioner must prove by clear and convincing evidence" that at least one of the twelve grounds enumerated in WIS. STAT. § 48.415 exists.  *Steven V.*, 271 Wis. 2d 1, ¶¶24-25; *see also* WIS. STAT. § 48.31(1).  If the petition is contested, "[t]he first step of the proceeding is the fact-finding hearing," the purpose of which is "to determine whether grounds exist for the termination of parental rights."  *Tammy W-G. v. Jacob T.*, 2011 WI 30, ¶18, 333 Wis. 2d 273, 797 N.W.2d 854 (citation omitted).  At this stage, "the parent receives a full complement of procedural rights."  *Brown Cnty. DHS v. Brenda B.*, 2011 WI 6, ¶¶31-32, 331 Wis. 2d 310, 795 N.W.2d 730.

¶22     In *Evelyn C.R. v. Tykila S.*, 2001 WI 110, ¶20, 246 Wis. 2d 1, 629 N.W.2d 768, our supreme court explained that:

> Terminations of parental rights affect some of parents' most fundamental human rights. At stake for a parent is his or her interest in the companionship, care, custody, and management of his or her child. Further, the permanency of termination orders work[s] a unique kind of deprivation. In contrast to matters modifiable at the parties' will or based on changed circumstances, termination adjudications involve the awesome authority of the State to destroy permanently all legal recognition of the parental relationship. For these reasons, parental termination decrees are among the most severe forms of state action.

(Citations and some quotation marks omitted.) The court further stated that "[d]ue to the severe nature of terminations of parental rights, termination proceedings require heightened legal safeguards against erroneous decisions." *Id.*, ¶21. Moreover, it stated that during the grounds phase "the parent's rights are paramount." *Id.*, ¶22.

¶23 The petition in this case alleged that Richard failed to assume parental responsibility under WIS. STAT. § 48.415(6). "Failure to assume parental responsibility is established by proof that the parent has never had a substantial parental relationship with the child." *Bobby G.*, 301 Wis. 2d 531, ¶45. A "substantial parental relationship" means "the acceptance and exercise of significant responsibility for the daily supervision, education, protection and care of the child." Sec. 48.415(6)(b). The court may consider

> whether the person has expressed concern for or interest in the support, care or well-being of the child, whether the person has neglected or refused to provide care or support for the child and whether, with respect to a person who is or may be the father of the child, the person has expressed concern for or interest in the support, care or well-being of the mother during her pregnancy.

*Id.* The court also specifically instructed the jury that, "[i]n making this determination you may consider the reasons for the parent's lack of involvement

… when you assess all of the circumstances throughout the child's entire life." *See* WIS JI—CHILDREN 346A.

## II. Ineffective Assistance of Counsel Claim

¶24    Richard argues that he received ineffective assistance of counsel during the grounds trial because his trial counsel failed to introduce any evidence to explain Richard's lack of contact with Morgan or any evidence showing that he was prevented from establishing a substantial parental relationship.    More specifically, Richard argues that his trial counsel failed to introduce evidence (1) that Richard sought visitation but was limited by a court order to email contact with the prospective adoptive parents who were seeking to terminate his parental rights, (2) of Rhodes's role as being hired by the prospective adoptive parents to process the adoption, (3) that the prospective adoptive parents were attempting to adopt his daughter and were not typical foster parents, and (4) about the context of the adoption generally, to supply a reason for Richard's lack of contact with Morgan and lack of willingness to engage with Rhodes and the prospective adoptive parents.  He argues that, without this evidence, the jury was generally left to infer that Richard made no effort to see Morgan and establish a parental relationship, thereby failing to assume parental responsibility.  We agree.

¶25    To prove ineffective assistance of counsel, a parent must show two elements:    (1) counsel's performance was deficient; and (2) the deficient performance resulted in prejudice to the defense. ***A.S. v. State***, 168 Wis. 2d 995, 1005, 485 N.W.2d 52 (1992) (adopting the analysis announced in ***Strickland v. Washington***, 466 U.S. 668 (1984), for TPR proceedings).  "An ineffective assistance of counsel claim presents a mixed question of fact and law." ***State v. Pico***, 2018 WI 66, ¶13, 382 Wis. 2d 273, 914 N.W.2d 95.  This court "will not

reverse the circuit court's findings of fact unless they are clearly erroneous." *Id.* However, this court "independently review[s], as a matter of law, whether those facts demonstrate ineffective assistance of counsel." *Id.*

¶26 Turning to the first prong of the analysis, "[t]o establish that counsel's performance was deficient, the defendant must show that it fell below 'an objective standard of reasonableness.'" *State v. Breitzman*, 2017 WI 100, ¶38, 378 Wis. 2d 431, 904 N.W.2d 93 (citation omitted). Applying this standard, we conclude that trial counsel's performance was deficient.

¶27 Trial counsel described her trial strategy at the *Machner* hearing as follows:

> I had wanted to show at trial how [Richard] had assumed parental responsibility.
>
> ....
>
> Specifically what he had done since he was aware when [Morgan] was conceived, after he found out that she was around, what he had done before and after she was born, what he had done before and after the court case started and, you know, basically what he had done up until the date the trial started.

However, inconsistent with the described strategy, trial counsel failed to introduce exactly what Richard had done in seeking visitation and the limitations the court-ordered visitation placed on Richard's ability to do much else, including meet his daughter.

¶28 Furthermore, trial counsel testified at the *Machner* hearing that she did not bring in evidence of the adoption because it is standard practice to leave evidence of an adoption out of the grounds phase of a TPR proceeding, but she also testified that this case is "a little bit different" than most TPRs that she has

dealt with because it was not pursued by "an ADA" (Assistant District Attorney) and that there was no child in need of protective services (CHIPS) case that existed prior to the filing of the TPR petition. Trial counsel also testified at the *Machner* hearing that she had no strategic reason for not questioning Richard about the fact that he sought visitation and she had not considered that there would be some danger in the jury hearing nothing about Richard's court-ordered visitation, that he tried to see his daughter, and that he was limited to email contact with the couple trying to adopt her. Moreover, when questioned about why she did not object to excluding references to the adoption from the grounds trial, she responded that it was "an interesting question" but that she would generally leave any adoption discussion for the disposition phase. She also testified that she understood why Richard would not want to provide financial or other support to the prospective adoptive parents in Alabama because their goal was to terminate his parental rights and adopt his daughter.

¶29 Considering the standard for failing to assume parental responsibility, trial counsel's stated strategy, and trial counsel's additional testimony at the *Machner* hearing, we conclude that her performance was deficient. Her testimony from the *Machner* hearing either indicates no specific strategy to exclude the evidence that Richard now identifies as necessary to provide context to the jury or a strategy that did not appropriately consider all the possibilities. Ordinarily, we are "highly deferential" to trial counsel's strategic decisions, and "[t]his court will not second-guess a reasonable trial strategy." *See State v. Domke*, 2011 WI 95, ¶¶36, 49, 337 Wis. 2d 268, 805 N.W.2d 364 (citation omitted). However, trial counsel's testimony does not demonstrate such a reasonable trial strategy given the nature of these proceedings and the

15

importance of the court's visitation order and the adoption in this context. Thus, we consider trial counsel's performance deficient.

¶30   Turning to the second prong of the analysis, Richard argues that his trial counsel's deficient performance prejudiced him. "To establish that deficient performance was prejudicial, the defendant must show that 'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" *Breitzman*, 378 Wis. 2d 431, ¶39 (citation omitted). "The focus of this inquiry is not on the outcome of the trial, but on 'the reliability of the proceedings.'" *State v. Thiel*, 2003 WI 111, ¶20, 264 Wis. 2d 571, 665 N.W.2d 305 (citation omitted). Moreover, "when a court finds numerous deficiencies in a counsel's performance, it need not rely on the prejudicial effect of a single deficiency if, taken together, the deficiencies establish cumulative prejudice," and "prejudice should be assessed based on the cumulative effect of counsel's deficiencies." *Id.*, ¶59.

¶31   Here, we conclude that trial counsel's failure to introduce the evidence Richard now identifies cumulatively prejudiced Richard's defense at the grounds phase of the TPR proceedings. Without evidence of the limited court-ordered visitation, the role of Rhodes and the prospective adoptive parents, and the context of the adoption, the jury was left to infer from the testimony that Richard made no effort to establish a parental relationship with Morgan.

¶32   Reviewing the testimony from the trial, the jury heard that the prospective adoptive parents were a foster placement or placement provider and Rhodes was a social worker. In the typical context of a termination of parental rights case, the social worker would be working towards the goal of reuniting the

biological parent with his or her child and the foster parents would not be actively seeking the termination of the parent's parental rights. However, that was not the case here where both the prospective adoptive parents and Rhodes were working to terminate Richard's parental rights and process the adoption. Emails exchanged between Rhodes and the prospective adoptive parents show they were far from neutral parties working to reunite parent and child. In fact, in Rhodes's progress notes that were never provided to the jury, the prospective adoptive parents wrote in a email to Rhodes, "[W]e're going to do whatever is necessary for our adoption," and Rhodes sent an email response saying, "We're doing our best to accommodate your wishes …. I pray this truly ends in your favor in June. I'm so sorry this has been so challenging."

¶33     Moreover, in the permanency plan report dated October 14, 2019, that Rhodes authored—twenty days after the TPR petition was filed—Rhodes wrote, "Bethany Christian Services believes that the termination of parental rights of [Michelle] and [Richard] is in the best interest of [Morgan] …." Further, the permanency plan that Rhodes also authored dated October 14, 2019, and filed with the court on October 19, 2019, provided that the goal of the plan was adoption. Clearly, the goal of Bethany Christian Services and Rhodes, as early as October 14, 2019, was to terminate Richard's parental rights and for the prospective adoptive parents to adopt Morgan. Thus, the picture provided to the jury relative to the prospective adoptive parents and Rhodes that they were foster parents and a social worker, respectively, was misleading. Had the jury heard more about who the prospective adoptive parents and Rhodes were, in addition to the evidence of the limited court-ordered communication between Richard and the prospective adoptive parents, there is a reasonable probability of a different

17

outcome because the jury would have been provided with an explanation for Richard's lack of engagement with the couple and Rhodes.

¶34     The jury also heard that Richard had never met Morgan, had never provided financial support, gifts, or other items for Morgan to the prospective adoptive parents, Rhodes, or Michelle,[12] and generally made no effort to parent Morgan.  Without hearing about the visitation order limiting Richard to email contact with the people trying to terminate his parental rights, and the context of the adoption, the testimony that Richard failed to ever meet Morgan or provide anything for Morgan to the couple, Rhodes, or Michelle was extremely damaging.  As his trial counsel stated at the *Machner* hearing, she could understand Richard's decision in this situation not to send financial support, gifts, or other items— without information about the adoption and the court order, the jury was left without the same ability to understand Richard's decision or understand why Richard had never even met his daughter.  Instead, from the testimony introduced at trial, the jury was left with the strong inference that Richard had the ability to meet his daughter and provide support for her, but he simply failed to do so.

¶35     Importantly, the applicable jury instruction specifically states that the jury may consider this information in assessing why Richard had never met Morgan, why he did not support her financially, why he never provided other items, such as gifts and clothing, to his daughter, and why he stopped email communication.  *See* WIS JI—CHILDREN 346A.  Consequently, we cannot have confidence in the outcome of this case because the jury was never allowed the

_____

[12] We note that as a result of the no-contact injunction that Michelle obtained in May 2019, Richard could have no contact with Michelle at all times relevant to this case.

opportunity to consider information with which it should have been provided. Notably, there were also two dissenting jurors, and the jury was also clearly looking for answers for Richard's lack of involvement because it sent a note to the judge asking, "Why was there no communication by [Richard] to the foster family from the end of November 2020 and now?" and the trial court could only tell the jury that there was no evidence in the record to answer the question. We conclude that there is, therefore, a reasonable probability of a different outcome if the jury had heard that Richard sought visitation but was limited by court order to email contact with the prospective adoptive parents who wanted his parental rights terminated, that the overall context of this case involved an adoption facilitated by Michelle, and who Rhodes and the prospective adoptive parents truly were.

¶36    In response, Michelle's counsel and the GAL argue that trial counsel's performance was not deficient for failing to question Richard about ending email communication because the answer Richard would give in response was unpredictable. Further, they argue that Richard stopped using the email of his own doing. However, we are not persuaded because, had the jury been told that Richard was limited by a court order to communicate only with the very people seeking to terminate his parental rights and adopt his daughter, the jury may have understood Richard's decision to end the communication, with or without asking Richard directly why he stopped email communication. Indeed, as the trial court acknowledged when it ordered the visitation, email would "hopefully begin to develop a relationship *with the potentially adoptive parents*"—not Morgan—and the prospective adoptive couple had control over whether the email could progress to text or phone calls or be stopped at any time the prospective adoptive parents wished to end communicating with Richard. (Emphasis added.)

19

¶37    Michelle's counsel and the GAL also argue that Richard failed to become the adjudicated father, thereby failing to assume parental responsibility. However, this argument similarly fails to consider the circumstances of this case. Given that the TPR was filed immediately after Morgan's birth, it is not clear that Richard would have benefitted from filing a paternity action in family court. Moreover, we note that Richard's trial counsel testified at the ***Machner*** hearing that she did not suggest Richard should immediately file an action in family court because she did not see any benefit in him doing so. We thus reject the argument that Richard did not receive ineffective assistance of counsel because he had failed to assume parental responsibility by failing to file a paternity action in family court.

¶38    Last, Michelle's counsel and the GAL further argue that the information Richard now identifies about the adoption is irrelevant to the grounds phase of the proceedings because the failure to assume parental responsibility is about what Richard did or did not do to establish a relationship, rather than the reasons behind it. As we have explained, this argument is belied by the fact that a jury is allowed to "consider the reasons for the parent's lack of involvement," and the prospective adoption in this case was one of a number of reasons for Richard's lack of involvement as it led to the court limiting Richard's visitation and it led to Richard's lack of trust in those with whom he was supposed to be interacting. *See* WIS JI—CHILDREN 346A. We, thus, reject their argument as to the role the adoption played in these unique proceedings in providing a reason for Richard's lack of involvement.

¶39    Although we have discussed this case as presenting a question of law, we cannot forget that this case affects a little girl whose fate still hangs in the balance. At the heart of this case is a child named Morgan, who was born on

September 14, 2019, to Michelle and her biological father Richard, but who has never lived with either of them. Since being discharged from the hospital after birth, Morgan has lived with the prospective adoptive parents who are committed to adopting her. Morgan is now approaching the age of three years old. This case has languished before the court for a prolonged period of time. As noted above, our supreme court has told us that:

> Termination of parental rights affect some of parents' most fundamental human rights. At stake for a parent is his or her "interest in the companionship, care, custody, and management of his or her child." Further, the permanency of termination orders "work[s] a unique kind of deprivation. In contrast to matters modifiable at the parties' will or based on changed circumstances, termination adjudications involve the awesome authority of the State to destroy permanently all legal recognition of the parental relationship." For these reasons, "parental termination decrees are among the most severe forms of state action."

*Evelyn C.R.*, 246 Wis. 2d 1, ¶20 (citations omitted). Further, "[d]ue to the severe nature of terminations of parental rights, termination proceedings require heightened legal safeguards against erroneous decisions." *Id.*, ¶21. Moreover, during the grounds phase "the parent's rights are paramount." *Id.*, ¶22. As noted, this standard is contrary to the standard applied by the trial court in deciding Richard's motion for visitation when it indicated that "the controlling factor here is what's in [Morgan's] best interest. Not what's in the parent's best interest."

¶40    As noted above, the petition in this case alleged that Richard failed to assume parental responsibility and that failure to assume parental responsibility is established by proof that the parent has never had a substantial parental relationship with the child. We note that in light of this standard and because of the severe nature of terminations of parental rights, termination proceedings require heightened legal safeguards against erroneous decisions. In that regard,

21

trial courts have to consider the effects of their orders. Here, the trial court did not apply the standard that Richard's rights were paramount during the grounds phase. While it recognized that as Morgan's biological father he would have some contact and visitation with her under normal circumstances, it then rejected face-to-face visits and did not even permit virtual visitation. The court's expressed reason for not allowing virtual visitation was that it would be disruptive to Morgan's routine, and although it was a low risk that some attachment between Richard and Morgan might occur it would be disruptive and not in Morgan's best interest if Richard's parental rights were terminated.

¶41    Thus, on remand the trial court should consider how its visitation order affects Richard's rights during the grounds phase, and not implement procedures that potentially create impediments to the establishment of a substantial parental relationship.

## CONCLUSION

¶42    In sum, we conclude that Richard received ineffective assistance of counsel when his counsel failed to introduce evidence of the court order limiting Richard to email contact with the prospective adoptive couple who wanted Richard's parental rights to be terminated so they could adopt his daughter, evidence of the role Rhodes and the prospective adoptive couple played in this case, and evidence of the adoption generally. Accordingly, we reverse the circuit court's order terminating Richard's parental rights and remand the cause to the trial court for a fact-finding hearing in accordance with WIS. STAT. § 48.424 to determine whether grounds exist for termination of Richard's parental rights to Morgan and, if necessary, for a dispositional hearing in accordance with WIS. STAT. § 48.427 on whether Richard's parental rights should be terminated in the

best interests of Morgan.  On remand, the new fact-finding hearing is to be held at the earliest reasonable opportunity.

*By the Court.*—Order reversed and cause remanded for further proceedings.

Not recommended for publication in the official reports.